AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
2/27/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: asi  DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California



United States of America

v.

Ruben Munoz TORRES and
Arturo Noe RAMON OXLAJ

Defendants.

Case No. 2:25-mj-01045-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, Brett Adams, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of February 25, 2025, in the County of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2320(a) | Trafficking in Counterfeit Goods or Services |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Brett Adams, Special Agent, HSI
Complainant's signature

Brett Adams, Special Agent, HSI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 2/27/2025

Judge's signature

City and state: Los Angeles, California

Hon. Jacqueline Chooljian, U.S.M.J.
Printed name and title

AUSA: Clifford Mpare (x4962)

**AFFIDAVIT**

I, Brett G. Adams, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been so employed since November 2022. I am assigned to the HSI Office of the Assistant Special Agent in Charge, Global Trade Investigations. My responsibilities involve investigating violations of trade fraud and intellectual property rights violations. Through my training, I have acquired knowledge of HSI's criminal investigative authority, applicable regulations and statutes, and various investigative techniques. I attended the HSI Academy, a 25-week criminal investigations training conducted at the Federal Law Enforcement Training Center, located in Brunswick, Georgia. At the HSI Academy, I was trained in all aspects of conducting criminal investigations, and I received several hundred hours of comprehensive, formalized instruction for investigations into such matters as the smuggling of narcotics and other contraband; firearms trafficking; human trafficking; narcotics distribution; criminal street gangs; money laundering; trade fraud; intellectual property rights violations; and asset identification, seizure, and forfeiture. My training also included instruction on electronic or digital data, evidence, and devices, including the

use of online accounts and electronic devices in relation to criminal offenses.

2. Before joining HSI, I worked for Customs and Border Protection ("CBP") for over three years. I attended CBP Officer Basic Training, where I received over 700 hours of law enforcement training. While with CBP, my duties included inspecting and examining passengers and workers arriving on cargo, cruise, and commercial vessels. I was part of the Special Enforcement Group, where I conducted plain clothes operations to interdict undocumented immigrant and drug smuggling vessels attempting to land in the United States without inspection. Prior to my service with CBP, I served in the active-duty military with the United States Coast Guard from 2013 to 2018. During this time, I completed numerous training exercises, including a five-week Boarding Officer course at the Federal Law Enforcement Training Center in Charleston, South Carolina.

3. Since joining HSI, I have investigated a variety of criminal offenses, including trade fraud, intellectual property rights violations, and drug trafficking. During these investigations, I have used various investigative techniques, including interviews, court-authorized searches of physical locations and the electronic devices and data retrieved from them, examining physical evidence, conducting surveillance, and reviewing financial, telephone, and other third-party records. I have also spoken to other personnel with the Department of Homeland Security with experience in auditing importations and

determining the value of importations. As a result of my experience and my conversations with other law enforcement personnel, I am familiar with the methods used by individuals to commit trade fraud, wire fraud, and other related offenses. I am also familiar with the methods used by individuals to conceal their activities from detection by law enforcement, and how evidence of those offenses is stored or saved.

## II. PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of a criminal complaint against and arrest warrants for Ruben Munoz TORRES ("TORRES") and Arturo Noe RAMON OXLAJ ("RAMON") for violations of Title 18, United States Code, § 2320a: Trafficking in Counterfeit Goods or Services. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all my knowledge of this investigation. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## III. BACKGROUND ON TRADEMARKS AT ISSUE

5. On February 26, 2025, I queried the United States Patent & Trademark Office ("USPTO") Internet database website

and learned the following information regarding Levi Strauss & CO.'s ("Levi's") registered trademarks:

    a.    The USPTO has registered the following trademark relating to Levi's and Levi's jeans:



It was registered on January 13, 1976, and is a "live" trademark.

    b.    The USPTO also has registered the following mark as in connection with the pocket design of Levi's jeans::



It was registered on December 9, 2003, and is a "live" trademark.

    c.   The USPTO also has registered the following mark in connection with the word "Levi's":

# LEVI'S

It was registered on December 23, 2014, and is a "live" trademark.

    d.   The USPTO also has registered the following mark in connection with the Levi's service mark:



It was registered on December 9, 2014, and is a "live" trademark.

    e.   The USPTO also has registered the following mark in connection with the Levi's word mark:



It was registered on May 31, 2016, and is a "live" trademark.

    6.    Also on February 26, 2025, I queried the USPTO Internet database website and learned the following information regarding Louis Vuitton's ("LV") registered trademarks:

        a.    The USPTO has registered the following trademark relating to LV:



It was registered on August 21, 2012, and is a "live" trademark.
//
//
//

7. Also, USPTO has registered the following trademark relating to LV:

# LOUIS VUITTON

It was registered on August 10, 1976, and is a "live" trademark for "LUGGAGE AND LADIES' HANDBAGS."

### IV. SUMMARY OF PROBABLE CAUSE

8. On February 25, 2025, the HSI Los Angeles Trade Fraud Group conducted a controlled purchase operation in the Santee Alley Fashion district in downtown Los Angeles. HSI utilized an Undercover Agent ("UCA") to make purchases of suspected counterfeit items in the area.

9. At approximately 12:00 p.m. the UCA met with TORRES at a small stand with hundreds of what purported to be Levi's jeans. On February 23, 2025, prior to this interaction, the Trade Fraud Group saw TORRES selling jeans at the same stand. The UCA spoke with TORRES and purchased ten pairs of jeans for $20 dollars each, totaling $200.

10. A private firm named "Investigative Consultants"[1] ("IC") was on scene with HSI when the UCA purchased the above-noted jeans from TORRES. Following that purchase, an HSI Agent

---

[1] IC is a private entity who routinely works with HSI and state and local law enforcement authorities in counterfeit goods investigations. IC represents both and Louis Vuitton (in addition to other large name brands in the fashion industry).

7

then sent photos of the purported Levi's jeans to an IC agent for examination. The IC agent confirmed they were counterfeit. Specifically, the IC agent determined that the tags on the jeans, stitching, and labeling were not like that of authentic Levi's jeans. TORRES was then taken into custody by HSI agents in a probable cause arrest for a violation of Title 18, United States Code, § 2320a: Trafficking in Counterfeit Goods or Services. TORRES then signed a Cease & Desist letter ("C&D Letter") from IC personnel and forfeited approximately 250 pairs of counterfeit Levi's jeans to them.

11. At approximately 12:30p.m., after the encounter with TORRES, the UCA approached RAMON in a small shop on Santee Alley. Inside that shop, clothing and luxury bags were displayed for sale that purported to be from brands such as LV, Chanel, Nike, and others. The UCA approached RAMON (who appeared to be the only person working inside the store) and asked RAMON about the authenticity of one of the handbags offered for sale that purported to be LV. In response, RAMON assured the UCA that the handbag had similar stitching as an authentic LV handbag. The UCA then purchased the purported LV handbag from RAMON.

12. Following that purchase, an HSI Agent then sent photos of the handbag to an IC agent for examination. The IC agent confirmed the handbag was counterfeit. Specifically, the IC agent saw that the label and stitching on the purported LV handbag differed from the label and stitching on an authentic LV

handbag. RAMON was then taken into custody by HSI agents in a probable cause arrest for a violation of Title 18 United States Code, § 2320a: Trafficking in Counterfeit Goods or Services. RAMON then signed a C&D letter from IC personnel and forfeited approximately $200,000 of merchandise to them.

### V. STATEMENT OF PROBABLE CAUSE

#### A. TORRES ARREST

13. Based on a review of a report composed by IC personnel and dated January 16, 2015, I learned the following:

   a. In January of 2015, officers from the Los Angeles Police Department and agents from HSI conducted a controlled purchase operation in Santee Alley in downtown Los Angeles. The operation targeted sellers of counterfeit products. TORRES and his brother Oscar were found to be selling counterfeit Levi's. TORRES signed a C&D Letter during the operation. The C&D Letter provides, "The merchant signing below knowingly sold counterfeit Levi's Jeans merchandise and agreed to stop all sales," and "I have knowingly sold counterfeit Levi's Jeans merchandise and promise to immediately stop all such sales." The C&D Letter was signed and dated by TORRES on January 9, 2015.

14. In February 2025, TORRES was again seen in Santee Alley area selling jeans. Specifically, on February 25, 2025, HSI conducted a controlled purchase and arrest operation in Santee Alley on TORRES. The UCA initiated contact with TORRES and made a purchase of ten pairs of jeans for $200.

15. Following the interaction and purchase of ten pairs of Levi's jeans, the UCA gave the jeans to a nearby team of HSI agents who sent detailed photos of the jeans' labels to IC personnel to assist with authentication of the jeans. IC personnel confirmed the jeans were counterfeit by looking at photos of three out of the five trademarks, mentioned above, that were on the purchased jeans. Based on their training and experience, the IC personnel concluded that the purported Levi's trademarks contained on the jeans differed from the trademarks contained on legitimate Levi's jeans and were counterfeit. HSI agents then arrested TORRES. The IC team served TORRES with a C&D letter shortly after TORRES was taken into custody, which TORRES agreed to sign. TORRES also agreed to forfeit the remaining approximately 250 pairs of jeans remaining on the stand. The C&D letter and receipt from IC stated the following, "I have knowingly sold counterfeit Levi's and promise to immediately stop all such sales." IC personnel took the jeans and assessed the approximate value of the approximately 250 pairs of jeans (had they been legitimate Levi's jeans) as approximately $12,500.

16. TORRES was searched incident to arrest and had $4,385 on his person. This money was seized by HSI as proceeds of TORRES's unlawful sales.

17. The following photos depict the actual jeans purchased by the UCA:





**B.   RAMON Arrest**

18.   During the same operation, the UCA (who was outfitted with a hidden audio/video ("A/V") recording device) initiated contact with RAMON who was selling purported luxury items at a small shop within Santee Alley.

19.   Based on my review of the A/V footage captured by the UCA, as well as my conversations with the UCA, I learned the following:

   a.   When the UCA asked RAMON about any Louis LV-branded items he had for sale, RAMON showed the UCA a handbag that purported to be LV-branded (and contained on its exterior elements of the trademarked design depicted in paragraph 6a, above).  The UCA then asked about the color of the stitching on the handbag and RAMON responded something to the effect of,

11

"that's how the real ones look," and RAMON proceeded to show the UCA a photo on his phone of what appeared to be a real LV handbag and stated "see?" as he pointed to the handbag on his phone. The UCA then noticed a handbag that appeared to have some disfigured stitching, and when the UCA asked RAMON about that handbag, RAMON responded something to the effect of "that one came out ugly."

    b. The UCA then proceeded to purchase the purported LV (as of February 27, 2025, a legitimate bag of this LV model retails for $2,620 dollars on LV's main website https://us.louisvuitton.com/). The UCA left the store and rendezvoused with HSI agents at a prearranged meeting location where the UCA gave the purported LV handbag to the agents. Then, those agents sent photos of the handbag to the IC personnel, who confirmed the handbag was counterfeit by examining its labels and markings. Based on their training and experience, the IC personnel concluded that the purported LV trademarks contained on the handbag differed from the trademarks contained on a legitimate LV handbag and were counterfeit. HSI then arrested RAMON shortly after.

    c. Following his arrest, IC personnel met with RAMON and served him two C&D Letters for LV and Chanel (RAMON's store contained counterfeit items that purported to be Chanel-branded as well). RAMON reviewed and signed the C&D Letters, that state in pertinent part, "I have knowingly sold counterfeit merchandise and promise to immediately stop all such sales."

   d. After the above-described purchase by the UCA, IC personnel entered RAMON's store and determined that he had numerous counterfeit items therein. RAMON forfeited those items to IC personnel, who determined that the value of the goods (if genuine) was approximately $200,000. RAMON was searched incident to arrest and had $975 on his person. This cash was seized by HSI as proceeds to the illegal activity.

   e. The following photos depict the actual handbag purchased by the UCA:




   20. Based on my knowledge of the case, my communications with other agents investigating this case, my communications with personnel IC, and review of audio video footage of the purchase, I believe TORRES and RAMON knowingly sold counterfeit

13

merchandise to unsuspecting customers. I also believe TORRES and RAMON made large monetary proceeds selling the counterfeit products.

## VI. CONCLUSION

21. For all the reasons described above, there is probable cause to believe that Ruben TORRES and Arturo RAMON violated Title 18, United States Code, § 2320a: Trafficking in Counterfeit Goods or Services.

/s/
_____
Brett Adams, Special Agent
Homeland Security
Investigations

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 27th day of
February 2025.

_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE